# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLLEEN PAUZA, on Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>KCG HOLDINGS, INC., CHARLES E. HALDEMAN, JR., DEBRA J. CHRAPATY, DANIEL COLEMAN, PETER R. FISHER, RENE M. KERN, JAMES T. MILDE, JOHN C. MORRIS, ALASTAIR RAMPELL, DANIEL F. SCHMITT, LAURIE M. SHAHON, COLIN SMITH, HEATHER E. TOOKES and ADRIAN WELLER,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Colleen Pauza ("Plaintiff"), on behalf of herself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through her counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for her Class Action Complaint:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of herself and all other public stockholders of KCG Holdings, Inc. ("KCG" or the "Company") against KCG and the members of KCG's Board of Directors (the "Board" or the "Individual Defendants," and together with KCG, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9 and to enjoin the vote on

a proposed transaction, pursuant to which KCG will be acquired by Virtu Financial, Inc. ("Virtu"), through its wholly-owned subsidiary Orchestra Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On April 20, 2017, KCG issued a press release announcing it had entered into an Agreement and Plan of Merger dated April 20, 2017 (the "Merger Agreement") to sell KCG to Virtu for $20.00 per share in cash (the "Merger Consideration"). Pursuant to the Merger Agreement, Merger Sub will merge with and into the Company, with the Company surviving the merger as an indirect wholly owned subsidiary of Virtu. The Proposed Transaction is valued at approximately $1.4 billion.

3.      On May 11, 2017, KCG filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that KCG stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) KCG's financial projections, relied upon by KCG's financial advisor Goldman Sachs & Co. LLC ("Goldman") in its financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Goldman; and (iii) the background process leading to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of the above-referenced sections of the Exchange Act, as KCG stockholders need such information to cast a fully-informed vote or make an appraisal decision in connection with the Proposed Transaction.

4.      In short, unless remedied, KCG's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them. Plaintiff seeks to

enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the Defendants because each Defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, most of the documents are electronically stored, and the evidence exists.  KCG is incorporated in Delaware and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## THE PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of KCG.

9.     Defendant KCG is a Delaware corporation with its principal executive offices located at 300 Vesey Street, New York, New York 10282.  KCG is an independent securities firm, offering investors a range of services designed to address trading needs.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "KCG."

10.     Defendant Daniel Coleman ("Coleman") has been Chief Executive Officer ("CEO") and a director of the Company since July 1, 2013.

11.     Defendant Charles E. Haldeman, Jr. ("Haldeman") is Non-Executive Chairman of the Board and has been a director of the Company since 2013.

12.     Defendant Debra J. Chrapaty ("Chrapaty") has been a director of the Company since 2015.

13.     Defendant Peter R. Fisher ("Fisher") has been a director of the Company since 2017.

14.     Defendant Rene M. Kern ("Kern") has been a director of the Company since 2013.

15.     Defendant James T. Milde ("Milde") has been a director of the Company since 2013.

16.     Defendant John C. Morris ("Morris") has been a director of the Company since 2013.

17.     Defendant Alastair Rampell ("Rampell") has been a director of the Company since 2015.

18.     Defendant Daniel F. Schmitt ("Schmitt") has been a director of the Company since 2013.

19.     Defendant Laurie M. Shahon ("Shahon") has been a director of the Company since 2013.

20.     Defendant Colin Smith ("Smith") has been a director of the Company since 2017.

21.     Defendant Heather E. Tookes ("Tookes") has been a director of the Company since 2017.

22.    Defendant Adrian Weller ("Weller") has been a director of the Company since 2017.

23.    Defendants Coleman, Haldeman, Chrapaty, Fisher, Kern, Milde, Morris, Rampell, Schmitt, Shahon, Smith, Tookes, and Weller are collectively referred to herein as the "Board" or the "Individual Defendants," and together with KCG, "Defendants."

## OTHER RELEVANT ENTITIES

24.    Virtu is a Delaware corporation with its principal executive offices located at 900 Third Avenue, 29th Floor, New York, New York 10022.  Virtu is a leading technology-enabled market maker and liquidity provider to the global financial markets.  Virtu's common stock is traded on the NASDAQ under the ticker symbol "VIRT."

25.    Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of Virtu.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own KCG common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of May 4, 2017, there were approximately 64,005,106 shares of Company common stock issued

and outstanding.  All members of the Class may be identified from records maintained by KCG or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

29.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

30.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

32.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

33.     KCG is a leading independent securities firm offering clients a range of services designed to address trading needs across asset classes, product types and time zones.  The

Company combines advanced technology with specialized client service across market making, agency execution, and trading venues, and engages in principal trading via exchange-based electronic market making. KCG has multiple access points to trade global equities, options, fixed income, currencies, and commodities via voice or automated execution.

34.    The Company was formed in July 2013 as a result of the strategic business combination of Knight Capital Group, Inc. and GETCO Holding Company, LLC. KCG has three operating segments: (i) Market Making; (ii) Global Execution Services; and (iii) Corporate and Other. The Market Making segment principally consists of market making in the cash, futures, and options markets across global equities, options, fixed income, currencies, and commodities. The Global Execution Services segment comprises agency-based trading and trading venues, offering execution services in global equities, options, futures, and fixed income on behalf of institutions, banks, and broker dealers. The Corporate and Other segment contains the Company's investments and manages the deployment of capital across the organization, among other things.

35.    On January 19, 2017, the Company issued a press release announcing its fourth quarter 2016 and full year financial results and highlights, including:

Fourth Quarter Highlights

- KCG recorded a pre-tax gain of $331.0 million from the sales of shares in Bats

- KCG Market Making increased market share of retail SEC Rule 605 U.S. equity share volume 5.0 percent year over year

- KCG Algorithmic Trading grew average daily U.S. equity share volume from the 25 largest U.S. asset managers 49.5 percent year over year

- KCG BondPoint set a new quarterly record for average daily fixed income par value traded with a 39.1 percent rise year over year

> • KCG reduced total shares outstanding by 22 percent during the quarter

36.     Commenting on the results, Defendant Coleman stated:

During the fourth quarter, we monetized a longstanding investment in Bats through a swap of substantially all of our stake for all KCG shares and warrants owned by General Atlantic. After the transaction plus additional open market purchases, KCG's shares outstanding declined to 67.2 million from 86.2 million from the prior quarter and the number of warrants outstanding decreased to 5.1 million from 13.2 million. Since the merger, KCG has returned a cumulative $835.7 million to equity stakeholders. Our focus on creating value for stockholders enabled KCG to increase tangible book value per share to $18.71 as of the end of 2016. From an operating perspective, revenues in the fourth quarter fell below our expectations reflecting the continuation of a difficult trading environment. However, a rise in revenues on an operating basis from the prior quarter reflects the improved market conditions starting in November.

37.     On April 20, 2017, the Company issued a press release announcing its first quarter financial results and highlights, including:

> • KCG Market Making increased market share of retail SEC Rule 605 U.S. equity share volume 5.5 percent year over year
>
> • KCG BondPoint set a new quarterly record for average daily fixed income par value traded with a 38.5 percent rise year over year
>
> • During the quarter, KCG repurchased 0.9 million shares for $13.3 million under the stock repurchase program

**The Sale Process**

38.     Jefferies LLC ("Jefferies") is KCG's largest stockholder, with beneficial ownership of approximately 24.5% of the outstanding Company common stock at the time the Company and Virtu entered into the Merger Agreement. In December 2016, and again in mid-February 2017, representatives of Virtu indicated to Richard Handler ("Handler"), the CEO and chairman of Jefferies, Virtu's possible interest in the Company, and communicated to Handler preliminary ranges of prices per share at which Virtu might consider making a proposal to

acquire KCG. The Proxy Statement fails to disclose any of these preliminary ranges of prices per share.

39.    On February 14, 2017, at Handler's suggestion, a managing director in investment banking at Jefferies met with Douglas Cifu ("Cifu"), Virtu's CEO, Joseph Molluso, Virtu's chief financial officer, and other Virtu representatives to discuss the Company.

40.    On February 23, 2017, Virtu delivered to KCG a written proposal to acquire the Company at a price in the range of $18.50 to $20.00 per share in cash.

41.    On February 26, 2017, the Board met to discuss Virtu's proposal and to consider other strategic opportunities that might be available to the Company. The Proxy Statement, however, fails to disclose what these strategic opportunities included. At the meeting, Defendant Coleman introduced a proposed plan to restructure certain aspects of the Company's business and return capital to its stockholders without pursuing a merger or sale of the Company (the "Restructuring Plan"). Coleman explained that the Company's management had been working on the Restructuring Plan for several months and that the offer had caused management to accelerate its thinking about the timing of any restructuring. The Board established a sub-committee to meet with potential independent financial advisors to advise the Company in connection with considering its strategic alternatives, including a transaction with Virtu, and appointed defendants Milde (chair), Kern, Tookes and Rampell as its members.

42.    On March 6, 2017, the committee decided to recommend to the Board that it engage Goldman to serve as the Board's independent financial advisor.

43.    On March 7, 2017, Handler and other representatives of Jefferies spoke to defendant Coleman about the Virtu offer and Handler encouraged KCG to engage with Virtu.

44.     At a March 10, 2017, Board meeting, Goldman presented to the Board, among other things, its preliminary financial analysis of the Virtu bid.  The Proxy Statement fails to disclose the implied per share value indications for KCG in this preliminary analysis.

45.     On March 14, 2017, Handler again reiterated to defendant Coleman, Jefferies' view that the Company should engage in discussions with Virtu regarding its proposal.  On the same day, defendant Haldeman spoke to Brian Friedman, the chairman of the executive committee of Jefferies, who reaffirmed Jefferies' view that the Company should engage in discussions with Virtu regarding its proposal.

46.     On March 15, 2017, the Board met with the Company's management, representatives of Goldman, and investment banking personnel from Jefferies who had assisted the Company in developing the Restructuring Plan.  Defendant Coleman presented the Restructuring Plan to the Board.  Goldman presented a preliminary financial analysis of the Company, including analysis using the Restructuring Plan, and a preliminary financial analysis of the Virtu proposal, and provided an update on the transaction process and a preliminary list of other potential strategic buyers.

47.     Later in the day on March 15, 2017, defendant Coleman sent a letter to Cifu responding to the initial Virtu proposal, and asking Cifu whether Virtu was prepared to increase its offer price.

48.     On March 16, 2017, Cifu sent a letter to defendant Coleman affirming, among other things, the price range of $18.50 to $20.00 per share.

49.     Also on March 16, 2017, Party A contacted defendant Coleman to inform him that it was interested in exploring a strategic combination with KCG.

50.    On March 17, 2017, the Company and Virtu entered into a non-disclosure agreement ("NDA").

51.    On March 22, 2017, the Company and Party A entered into an NDA including a standstill agreement. The Proxy Statement fails to disclose whether the standstill agreement is still in effect and operates to preclude Party A from making a topping bid for the Company. Party A subsequently dropped out of the process.

52.    On March 23, 2017, defendant Haldeman contacted the members of the Board to recommend that Goldman reach out to the other possible bidders for the Company initially identified by Goldman and approved by defendant Haldeman and the Company's management.

53.    On March 27, 2017, Goldman began to contact other possible bidders. On March 29, 2017, Goldman reported that it had contacted six possible bidders and that one, Party B, had expressed interest in receiving more information about the Company. Party B subsequently withdrew its interest in pursuing an acquisition of KCG.

54.    On April 10, 2017, Virtu sent the Company a revised proposal to acquire the Company for $18.50 per share in an all cash transaction. The Board subsequently rejected Virtu's revised proposal at its April 11, 2017 meeting.

55.    On April 12, 2017, KCG received a revised bid from Virtu to acquire the Company in an all cash transaction for $20.00 per share.

56.    At an April 12, 2017 Board meeting, the Board discussed Virtu's revised proposal and agreed to respond with a counter-offer for a purchase price of $20.21 per share, the book value per share of the Company as of March 31, 2017.

57.    The Board met on April 17, 2017 to discuss the status of the proposed merger with Virtu, with Goldman reporting that Virtu was unwilling to increase its offer above $20.00 per share.

58.    The Board met again on April 19, 2017 to discuss the progress towards a final merger agreement with Virtu, and tentatively agreed to a purchase price equal to $20.00 per share. Also at the April 19, 2017 Board meeting, acting by written consent, the Board approved the forecasts for the Company used in connection with the Restructuring Plan (the "Forecasts"), but not the execution of the Restructuring Plan, and the use of such forecasts in Goldman's financial analysis of the transaction with Virtu.

59.    On April 20, 2017, the Board met and approved the Merger Agreement.  At the same time, and at Virtu's request, Jefferies entered into a voting agreement with Virtu pursuant to which it agreed to vote all of the shares of the Company common stock that it is entitled to vote in favor of the Proposed Transaction.

**The Proposed Transaction**

60.    On April 20, 2017, KCG issued a press release announcing the Proposed Transaction.  The press release states, in relevant part:

> **NEW YORK, New York – April 20, 2017 – KCG Holdings, Inc. (NYSE: KCG)** today announced that it has reached a definitive agreement for Virtu Financial, Inc. (NASDAQ: VIRT) to acquire all outstanding shares of KCG's Class A Common Stock for $20.00 per share in cash.  The price represents a premium of 46 percent over KCG's closing share price of $13.73 on March 14, 2017, prior to news reports of the proposal.
>
> Charles Haldeman, Non-Executive Chairman of the Board of Directors, said "After a thorough evaluation, KCG's Board of Directors concluded that the proposal from Virtu provides compelling value for KCG's stockholders. Further, the combination of Virtu and KCG will create a true industry leader with greater diversification and scale."
>
> Goldman, Sachs & Co. is serving as the financial advisor and Sullivan & Cromwell LLP is providing legal advice to KCG.

**Insiders' Interests in the Proposed Transaction**

61.     KCG insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and KCG's public stockholders.

62.     Company insiders stand to reap substantial financial benefits for securing the deal with Virtu. Pursuant to the Merger Agreement, each Company option and restricted stock unit will be converted into the right to receive cash payments. The following table summarizes the cash payments the executive officers stand to receive in connection with their vested and unvested equity awards, as well as their outstanding shares of Company common stock in the Proposed Transaction:

| | Unvested RSUs (#) | Aggregate Merger Consideration in Respect of RSUs ($) | Unvested Options (#) | Aggregate Merger Consideration in Respect of Unvested Options ($) | Estimated Total Merger Consideration in Respect of Company Equity Awards ($) |
|---|---|---|---|---|---|
| Daniel Coleman | 217,133 | 4,342,660 | 1,333,333 | 0 | 4,342,660 |
| Steffen Parratt | 60,860 | 1,217,200 | 0 | 0 | 1,217,200 |
| Philip Allison | 189,028 | 3,780,560 | 0 | 0 | 3,780,560 |
| Ryan Primmer | 182,556 | 3,651,120 | 0 | 0 | 3,651,120 |
| Greg Tusar | 173,354 | 3,467,080 | 0 | 0 | 3,467,080 |
| Jonathan Ross [1] | 101,380 | 2,027,600 | 0 | 0 | 2,027,600 |
| Other Executive Officers (as a group) [2] | 268,535 | 5,370,700 | 0 | 0 | 5,370,700 |
| Non-Employee Directors (as a group) [3] | 84,368 | 1,687,360 | 0 | 0 | 1,687,360 |

63.     Moreover, if they are terminated in connection with the Proposed Transaction, KCG's named executive officers stand to receive substantial cash severance payments in the form of golden parachute compensation. The following table sets forth the golden parachute compensation the Company's named executive officers stand to receive:

|  | Cash ($) [1] | Equity ($) [2] | Total ($) |
|---|---|---|---|
| Daniel Coleman | 7,026,798 | 4,342,660 | 11,369,458 |
| Steffen Parratt | 1,769,645 | 1,217,200 | 2,986,845 |
| Philip Allison | 3,225,750 | 3,780,560 | 7,006,310 |
| Ryan Primmer | 3,526,978 | 3,651,120 | 7,178,098 |
| Greg Tusar | 3,444,602 | 3,467,080 | 6,911,682 |
| Jonathan Ross [3] | — | 2,027,600 | 2,027,600 |

(1) Amounts reflect the following payments, all of which are "double trigger" payments that are contingent upon a qualifying termination of the named executive officer: (a) cash non-compete/non-solicit payments (or for Mr. Allison, payment in lieu of notice); (b) an annual incentive for the fiscal year in which the termination occurs, paid in cash and (c) payment in respect of healthcare continuation that would become payable upon a qualifying termination of employment, as follows:

|  | Non-Compete Payments ($) [a] | Payment in Lieu of Notice ($) [b] | 2017 Annual Bonus Payment ($) [c] | Healthcare Continuation Payment ($) [d] |
|---|---|---|---|---|
| Daniel Coleman | 2,000,000 | — | 5,000,000 | 26,978 |
| Steffen Parratt | 500,000 | — | 1,250,000 | 19,645 |
| Philip Allison | — | 225,750 | 3,000,000 | — |
| Ryan Primmer | 500,000 | — | 3,000,000 | 26,978 |
| Greg Tusar | 417,624 | — | 3,000,000 | 26,978 |
| Jonathan Ross | — | — | — | — |

64. Of note, in connection with negotiating the Merger Agreement, the parties agreed that each executive officer would be eligible to earn a bonus for the 2017 fiscal year in an amount determined by defendant Coleman. As set forth above, KCG's executive officers as a whole stand to receive $15.25 million in bonus payments, with defendant Coleman himself set to receive a $5 million windfall.

**The Proxy Statement Contains Material Misstatements or Omissions**

65. The Defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to KCG's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting or appraisal decision on the Proposed Transaction.

66.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning:  (i) KCG's financial projections, relied upon by KCG's financial advisor, Goldman; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Goldman; and (iii) the background process leading to the Proposed Transaction.  Accordingly, KCG stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning KCG's Financial Projections***

67.    The Proxy Statement fails to disclose material information relating to the Forecasts, provided by KCG's management and relied upon by Goldman for its analyses.

68.    For example, the Proxy Statement sets forth:

*Illustrative Discounted Cash Flow Analysis.*  Using the Forecasts, Goldman Sachs performed an illustrative discounted cash flow analysis on the Company. Using discount rates ranging from 9.0% to 11.0%, reflecting estimates of the Company's weighted average cost of capital, Goldman Sachs discounted to present value as of March 31, 2017 (i) ***estimates of unlevered free cash flow for the Company for the last nine months of 2017 and for the years 2018 through 2021 as reflected in the Forecasts*** and (ii) a range of illustrative terminal values for the Company, which were calculated by applying perpetuity growth rates ranging from (2.0)% to 2.0%, to a terminal year estimate of the free cash flow to be generated by the Company, as reflected in the Forecasts. Goldman Sachs derived ranges of illustrative enterprise values for the Company by adding the ranges of present values it derived above.  Goldman Sachs then subtracted, from the range of illustrative enterprise values it derived for the Company, the amount of the Company's estimated net debt as of March 31, 2017, as provided by management of the Company, to derive a range of illustrative equity values for the Company. Goldman Sachs then divided the range of illustrative equity values it derived by the number of fully diluted outstanding shares of the Company, as provided by management of the Company, to derive a range of illustrative present values per share ranging from $15.94 to $27.09.

(Emphasis added).  The Proxy Statement, however, fails to disclose the Company's unlevered free cash flows for the projection period.

69.    Additionally, with respect to the Forecasts relied upon by Goldman in performing its analyses, the Proxy Statement discloses projections for various non-GAAP metrics including Net Revenue, Adjusted EBITDA, and Adjusted Earnings per Share, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to GAAP.  The omission of the aforementioned line item projections renders the non-GAAP projections included in the Proxy Statement materially misleading and incomplete.

70.    The importance of reconciling between GAAP and non-GAAP financial measures has long been widely acknowledged.  The SEC adopted "Regulation G" in 2003, in response to the mandate set forth in Section 401(b) of the Sarbanes-Oxley Act that rules be enacted to regulate the use of pro forma financial information.  Regulation G prohibits the use of non-GAAP financial measures outside of SEC filings unless they are accompanied by the most directly comparable GAAP accounting measure, as well as a reconciliation of the two.  Such reconciliations were deemed necessary to address the proliferation of non-GAAP financial measures lacking a uniform definition and therefore carrying the risk of misleading investors.

71.    The omission of this information renders the following statements in the Proxy Statement false and/or materially misleading in contravention of the Exchange Act:

(a)    From page 30 of the Proxy Statement:

The following table summarizes selected unaudited prospective financial data per the Restructuring Plan for the fiscal years ending December 31, 2017 through December 31, 2021.

| Metric (as of December 31 of each year and, other than per share amounts, in millions of dollars): | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|
| Net Revenues | $    672 | $    716 | $    746 | $    779 | $    816 |
| Adjusted EBITDA[(1), (2)] | 190 | 256 | 269 | 283 | 300 |
| Adjusted Earnings per Share[(3)] | 0.84 | 1.71 | 2.24 | 3.06 | 3.57 |

(1) Reflects one-time items contemplated in the Restructuring Plan including gains on sales of assets, professional fees associated with asset sales and writedown of assets, among others.

(2) "EBITDA" means earnings before interest, taxes, depreciation and amortization.

(3) Reflects adjusted net income attributable to the Company assuming the implementation of the Restructuring Plan including using 50% of net income annually to repurchase shares.

### Material Omissions Concerning Goldman's Financial Analyses

72.     The Proxy Statement describes Goldman's fairness opinion and the various valuation analyses it performed in support of its opinion.   However, the description of Goldman's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, KCG's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Goldman's fairness opinion in making their voting or appraisal decision with respect to the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to KCG's stockholders.

73.     For example, with respect to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:  (a) the definition of unlevered free cash flow; (b) the estimates of unlevered free cash flow for the Company for the last nine months of 2017 and for the years 2018 through 2021; (b) the terminal year estimate of the free cash flow to be generated by the Company; (c) the Company's estimated net debt as of March, 31, 2017, as

provided by Company management; (d) the inputs used to derive the range of discount rates of 9.0% to 11.0%; and (e) the implied terminal value multiples resulting from the analysis.

74.     With respect to Goldman's *Selected Transactions Analysis*, the Proxy Statement fails to disclose what specific information was analyzed by Goldman with respect to the selected transactions, excluding the Knight Capital Group, Inc. / GETCO Holdings Company, LLC transaction.

75.     The omission of this information renders the following statements in the Proxy Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     From page 33 of the Proxy Statement:

*Illustrative Discounted Cash Flow Analysis.*   Using the Forecasts, Goldman Sachs performed an illustrative discounted cash flow analysis on the Company. Using discount rates ranging from 9.0% to 11.0%, reflecting estimates of the Company's weighted average cost of capital, Goldman Sachs discounted to present value as of March 31, 2017 (i) estimates of unlevered free cash flow for the Company for the last nine months of 2017 and for the years 2018 through 2021 as reflected in the Forecasts and (ii) a range of illustrative terminal values for the Company, which were calculated by applying perpetuity growth rates ranging from (2.0)% to 2.0%, to a terminal year estimate of the free cash flow to be generated by the Company, as reflected in the Forecasts. Goldman Sachs derived ranges of illustrative enterprise values for the Company by adding the ranges of present values it derived above. Goldman Sachs then subtracted, from the range of illustrative enterprise values it derived for the Company, the amount of the Company's estimated net debt as of March 31, 2017, as provided by management of the Company, to derive a range of illustrative equity values for the Company.   Goldman Sachs then divided the range of illustrative equity values it derived by the number of fully diluted outstanding shares of the Company, as provided by management of the Company, to derive a range of illustrative present values per share ranging from $15.94 to $27.09.

(b)     From page 34 of the Proxy Statement:

*Selected Transactions Analysis.*   Goldman Sachs analyzed certain information relating to the following selected transactions in the electronic trading industry since May 2011:

| Selected Transactions | | |
| --- | --- | --- |
| Date Announced | Acquiror(s) | Target |
| March 22, 2017 | Quantlab Financial | Teza Group |

| | | |
|---|---|---|
| May 16, 2016 | Citadel Securities | Citigroup's Automated Trading Desk division |
| February 5, 2016 | Citadel Securities | The Company's NYSE DMM Operations |
| January 26, 2016 | GTS | Barclays PLC's NYSE DMM trading business |
| January 14, 2015 | DRW Trading Group | Chopper Trading |
| December 7, 2014 | Temasek | 10% stake in Virtu Financial, Inc. |
| September 18, 2014 | Joseph Scoby (PEAK6 Advisors CEO) | PEAK6 Advisors LLC |
| May 22, 2014 | IMC Financial Markets | The Goldman Sachs Group Inc.'s NYSE DMM unit |
| March 6, 2014 | FXCM / Principals of Lucid Markets Trading Ltd. | Infinium Capital |
| October 23, 2013 | Susquehanna International Group | E*Trade's G1 Execution Services unit |
| December 19, 2012 | GETCO Holding Company, LLC | Knight Capital Group, Inc. |
| June 14, 2012 | FXCM | 50% controlling interest in Lucid Markets Trading Ltd. |
| January 17, 2012 | Cowen Group | Algorithmic Trading Management |
| May 11, 2011 | Virtu Financial / Silver Lake Capital | Madison Tyler Holdings LLC |

While none of the target companies that participated in the selected transactions are directly comparable to the Company, the target companies that participated in the selected transactions are companies with operations that, for the purposes of analysis, may be considered similar to certain of the Company's results, market size and product profile. For the only selected transaction for which detailed financial information was publicly available, the Knight Capital Group, Inc. / GETCO Holding Company, LLC transaction, Goldman Sachs calculated and compared Enterprise Value, or EV (as defined below) as a multiple of the estimated earnings before interest, taxes, depreciation and amortization, or EBITDA (as defined below), using publicly available Wall Street research, for the year in which the transaction occurred, resulting in an EV / EBITDA multiple of 7.2x.  Goldman Sachs identified an illustrative range of EV / EBITDA multiples of 6.0x - 10.0x and applied that range of illustrative multiples to the Company's estimated 2017 adjusted EBITDA, as reflected in the Forecasts, which resulted in a range of illustrative prices per share of Company common stock of $12.17 to $23.49.

76.    Without such undisclosed information, KCG stockholders cannot evaluate for themselves whether the financial analyses performed by Goldman were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required to ensure that stockholders can fully evaluate the extent to which Goldman's opinion and analyses should factor into their voting or appraisal decision with respect to the Proposed Transaction.

***Material Omissions Concerning the Flawed Process***

77.    The Proxy Statement also fails to disclose or misstates material information relating to the background process leading up to the Proposed Transaction, including:

(a)    Whether Jefferies or Virtu initiated conversations regarding Virtu's possible acquisition of the Company;

(b)    The preliminary ranges of prices per share set forth by Virtu for a possible proposal to acquire the Company indicated to Handler in December 2016 and again in mid-February 2017;

(c)    The strategic opportunities for the Company discussed at the February 26, 2017 Board meeting;

(d)    The implied per share value indications for the Company in Goldman's preliminary financial analysis presented to the Board at its March 10, 2017 meeting;

(e)    The key assumptions underlying the Company's Restructuring Plan and how the Restructuring Plan differed from the plan the Company was operating under;

(f)    Whether the standstill provision in the NDA entered into between the Company and Party A is still in effect and/or contains a "don't-ask-don't-waive" standstill provision that is presently precluding Party A from making a topping bid for the Company;

(g)      Who first included the requirement that "unless the Merger Agreement is terminated, the Company must convene the special meeting and submit the Merger Agreement to Company stockholders even if the Board has withdrawn the Company recommendation for the merger proposal"; and

(h)      The specific timing that the parties agreed that each KCG executive officer would be eligible to earn a bonus for the 2017 fiscal year in an amount to be determined by defendant Coleman, and whether defendant Coleman was allowed to determine his own bonus of $5,000,000.

78.      Defendants' failure to provide KCG stockholders with the foregoing material information renders the statements in the "Background of the Merger," "Reasons for the Merger; Recommendation of the Company Board of Directors," "Unaudited Prospective Financial Information," and "Opinion of Goldman Sachs & Co. LLC" sections of the Proxy Statement false and/or materially misleading and constitutes a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the expiration of the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting or appraisal decision on the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

79.  Plaintiff repeats all previous allegations as if set forth in full.

80.  During the relevant period, Defendants disseminated the false and misleading
Proxy Statement specified above, which failed to disclose material facts necessary to make the
statements, in light of the circumstances under which they were made, not misleading in
violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

81.  By virtue of their positions within the Company, the Defendants were aware of
this information and of their duty to disclose this information in the Proxy Statement.  The Proxy
Statement was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented
and/or omitted material facts, including material information about the sales process for the
Company, the financial analyses performed by the Company's financial advisors, and the actual
intrinsic standalone value of the Company.  The Defendants were at least negligent in filing the
Proxy Statement with these materially false and misleading statements.

82.  The omissions and false and misleading statements in the Proxy Statement are
material in that a reasonable stockholder would consider them important in deciding how to vote
on the Proposed Transaction.

83.  By reason of the foregoing, the Defendants have violated Section 14(a) of the
Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

84.  Because of the false and misleading statements in the Proxy Statement, Plaintiff
and the Class are threatened with irreparable harm, rendering money damages inadequate.
Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

<u>COUNT II</u>

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

85.    Plaintiff repeats all previous allegations as if set forth in full.

86.    The Individual Defendants acted as controlling persons of KCG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of KCG, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

87.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

88.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

89.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Proxy Statement purports to describe the various issues and

information that they reviewed and considered—descriptions the Company directors had input into.

90.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

91.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, KCG's stockholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in her favor on behalf of KCG, and against Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to KCG stockholders;

C.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 23, 2017

WEISSLAW LLP

By _____

Richard A. Acocelli
1500 Broadway, 16th Floor
New York, New York 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010
Email: racocelli@weisslawllp.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone:  (212) 308-5858
Facsimile:  (212) 214-0506
Email:  fortunato@bespc.com

*Attorneys for Plaintiff*